IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT JACKSON
August 4, 2009 Session

**STATE OF TENNESSEE v. COREY ESHMON**

**Direct Appeal from the Criminal Court for Shelby County**
**No. 05-02948      James M. Lammey, Jr., Judge**

_____

**No. W2008-00109-CCA-R3-CD   -   Filed September 23, 2009**
_____

The defendant, Corey Eshmon, was convicted by a Shelby County jury of one count of aggravated robbery, a Class B felony; two counts of aggravated assault, a Class C felony; and one count of theft of property under $500, a Class A misdemeanor. The trial court sentenced him as a Range I offender to eight years for the aggravated robbery conviction, three years for each of the aggravated assault convictions, and eleven months, twenty-nine days for the theft conviction. Finding the defendant to be a dangerous offender, the court ordered that the robbery sentence run consecutively to one of the assault sentences, for an effective sentence of eleven years in the Department of Correction. In a timely appeal to this court, the defendant raises the following issues: (1) whether the trial court erred in denying his motion to suppress witness identifications; (2) whether the evidence was sufficient to sustain the convictions; and (3) whether the trial court erred in ordering consecutive sentencing. Following our review, we affirm the judgments of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Criminal Court Affirmed**

ALAN E. GLENN, J., delivered the opinion of the court, in which JOHN EVERETT WILLIAMS and J.C. MCLIN, JJ., joined.

Marty B. McAfee and Vicki M. Carriker (on appeal); and Edward Bronston (at trial), Memphis, Tennessee, for the appellant, Corey Eshmon.

Robert E. Cooper, Jr., Attorney General and Reporter; Rachel E. Willis, Assistant Attorney General; William L. Gibbons, District Attorney General; and Greg Gilbert and David Zak, Assistant District Attorneys General, for the appellee, State of Tennessee.

**OPINION**

**FACTS**

During the very early morning hours of January 2, 2005, Edward Castor, Andrea Butler, Melanie Butler, and Jennifer Wiles were stopped in Castor's Chevrolet pickup truck at a red light at a Memphis intersection when a man wearing a hooded sweatshirt jumped out of the passenger side

of a Mitsubishi sedan, placed a gun to driver Andrea Butler's head, and demanded the truck. As the victims were exiting the truck, the man struck Wiles in the head with his pistol, apparently angered because she was not moving fast enough. He then fled in the truck, in the process taking Andrea Butler's purse containing $150 in cash and Castor's cell phone. A few hours later, Castor identified the handcuffed defendant sitting in the backseat of a squad car as the man who had placed the gun to Andrea Butler's head and stolen Castor's truck. Later that same day, Castor, Wiles, and sisters Andrea and Melanie Butler[1] each identified the defendant from a photographic array they were separately shown by the police.

The defendant and a codefendant, Prentice Pleas, were indicted together for the aggravated robberies of Andrea Butler and Edward Castor and the defendant was indicted alone for the aggravated assaults of Melanie Butler and Jennifer Wiles. At the conclusion of their joint trial, the defendant was convicted of the aggravated robbery of Castor and the aggravated assaults of Melanie Butler and Wiles. For count one of the indictment, which charged him with the aggravated robbery of Andrea Butler, the jury convicted the defendant of the lesser-included offense of theft of property under $500. Pleas was convicted of theft of property under $500 and theft of property over $10,000.

### Suppression Hearing

Prior to trial, the defendant moved to suppress the witness identifications, arguing that the showup procedure was impermissibly suggestive and tainted the later photographic identifications. He further argued that the photographic identifications were in themselves impermissibly suggestive because Castor described the robber as having gold teeth and he was the only one of the six men pictured with his mouth open.

At the hearing on the motion to suppress, Shelby County Sheriff's Deputy Matthew Keaton testified that at approximately 4:00 a.m. on January 2, 2005, he and his partner, Officer Michael Hoard, initiated a traffic stop of a blue Chevrolet pickup truck with expired tags that was traveling southbound on Highway 51 in Millington. They activated their blue lights as they passed Navy Road, but the driver, whom he later identified as the defendant, did not immediately stop. Instead, he moved into the right lane, then into the left turn lane, then back into the right lane before pulling into the parking lot of the Days Inn located at Highway 51 and Babe Howard, where he jumped from the vehicle and began running northbound on Highway 51.

Officer Keaton testified that he exited his squad car and pursued the defendant on foot to the area of Navy Road, where the defendant finally stopped running and was taken into custody. He said he later learned that a second individual had fled from the passenger side of the pickup truck at the same time as the defendant. After Officer Keaton determined that the defendant was not the registered owner of the truck, another officer contacted the owner and learned that the vehicle had been stolen. Officer Keaton stated that the handcuffed defendant was sitting in the back of his squad

---

[1] Because these two victims share the same last name, we will, for simplicity's sake, periodically refer to them in this opinion by their first names only. We intend no disrespect in doing so.

car while he was completing his paperwork when the registered owner arrived at the scene to identify the truck.

On cross-examination, Officer Keaton testified that he remained with the defendant at the hotel parking lot for approximately an hour and a half to two hours before transporting him to jail. He acknowledged that the defendant was the only handcuffed individual at the scene during that time.

Edward Castor testified that on January 2, 2005, he, his girlfriend, Andrea Butler, Andrea's sister, Melanie, and a friend, Jennifer Wiles, were stopped in his 1999 blue, three-door Chevrolet Silverado pickup truck at the red light at Macon and National when the defendant took the truck from them by holding a gun to Andrea's face. Castor made a positive courtroom identification of the defendant as the man who had taken his truck and said that Andrea was driving at the time, he was in the front passenger seat, and Melanie and Wiles were in the back passenger seats. He stated that just before the robbery, Andrea had turned to him and commented that the individuals in the next vehicle were looking at his truck. By the time she turned back around, the defendant had placed a gun to her face through the open driver's window. The defendant was wearing a hooded sweatshirt but made no attempt to conceal his face, and Castor was able to see that he had a gold "grill" covering at least six of his top teeth.

Castor testified that the defendant cocked his gun, threatened to shoot Andrea if Castor moved, and kept his gun trained on her as she exited the vehicle and went around to the passenger side. According to Castor, he sat and watched the defendant for approximately three minutes before he realized that he had to get out and open his door to let Melanie and Wiles out of the backseat. He said that the defendant ordered the girls to "get the fuck out" before he shot someone, accused them of taking too long, and hit Wiles in the head with his pistol as she was exiting. The defendant then took off in the truck, driving in the same direction as the vehicle in which he had been riding, a Mitsubishi sedan, which departed the scene just before him.

Castor testified that the police arrived to take a report at approximately 2:30 a.m. and that he spent the next hour and a half "looking for [his] truck." The next time he saw it was at approximately 5:00 a.m. when he, his brother, and his father, the registered owner, went to Millington to identify it where it had been recovered. While there, an officer asked him if the individual in the backseat of a squad car was the man who had pointed the gun at his girlfriend's head. Castor said that it was almost daylight at the time and that he immediately recognized the defendant by his face. He explained that he remembered him clearly because only a couple of hours earlier he had watched him hold a pistol to his girlfriend's head. He did not know if the defendant was handcuffed at the time he identified him. None of the girls accompanied him to Millington to identify the truck.

The next day Castor, Melanie, Andrea, and Wiles drove together to the robbery bureau, where they gave their statements to police. They were in a large, long room containing many desks, were separated and interviewed individually, and were unable to hear each other's conversations. The girls were across the room from him when he identified the defendant from the six-person photographic array, and he never talked to them about which photograph he had chosen.

-3-

On cross-examination, Castor estimated that the robbery occurred at approximately 1:30 a.m. He said that Andrea was driving because she was pregnant and had not had anything to drink. Wiles had not had anything to drink either, but both he and Melanie had had some gin and juice about two hours earlier. He identified the defendant in the squad car by his face, not his teeth, as he did not see any gold teeth and did not think the defendant even had his mouth open at the time. He acknowledged that the defendant was the only one of the six individuals pictured in the photographic array whose teeth were visible but said he "just picked who [he] remembered."

Upon questioning by the trial court, Castor testified that he had been present earlier in the hallway outside the courtroom with Andrea, Melanie, and Wiles when the defendant called Andrea a "ho" and a "bitch" and asked if any of them worked at Burlington Coat Factory. He stated that Melanie asked the defendant if he were a stalker, and the defendant replied that he had his sources.

Melanie Butler positively identified the defendant as the man who placed a gun to her sister's head during the robbery, which she estimated occurred between 2:00 and 2:15 a.m. She said that she had had less than a pint of gin and tonic and that Castor had had a couple of drinks, but neither her sister, who was eight and a half months pregnant, nor Wiles, who was only seventeen, had been drinking. The defendant was dressed in a black hooded sweatshirt, had gold teeth, and wore his hair "all twisted up[.]" They were waiting at a red light when Andrea told them that a man in the vehicle beside them had been looking at the truck's rims and had just reached under the seat. When the witness looked over, the defendant was getting out of the vehicle and was "right at the window before [she] could even blink [her] eyes."

The witness testified that she never took her eyes off the defendant during the entire episode, which she estimated lasted approximately three minutes. She expressed her confidence in her identification, testifying that she would never forget his face:

> I could see him the whole time, but when the door opened, the light came on in the truck, and I got a plain look at his face, and I'll never forget his face as long as I live because I thought he was going to shoot my sister. He held the gun this far from her head, and she turned her face so that way he wouldn't shoot her in the face in case he was to like pull the gun. And . . . as soon as he put the gun to her head, when she was trying to get out of the tuck because he was like, "Get out of the truck, get out of the truck," and when she was trying to get out, . . . she tried to put the truck up in park, and the truck jumped a little bit like it was going to take off, and . . . he looked right at all of us in the truck, and he said, "If you move this truck" -- and I don't want to cuss, but he said, you know, "I'm gonna fuckin' kill you."

The witness testified that she did not go to the scene of the defendant's arrest. The next day, however, she, Andrea, Wiles and Castor went downtown together to give their statements to police. She said they were separated and taken to different areas of a large room with approximately twenty-five desks divided by cubicles, so that she was unable to see or hear the others as she gave her statement. She was then taken into a small office, where she was shown several photographic arrays from which she positively identified the defendant as the gunman who had stolen Castor's truck. She identified her signature and writing on the photographic array, which showed that her identification

-4-

of the defendant occurred at 1:10 p.m. on January 2, 2005. She said that she and the others were kept separate during the procedure and instructed not to talk to each other about which photographs they had chosen.

The witness described her earlier encounter with the defendant outside the courtroom, testifying that her sister had "casually leaned over" and said to the group, "There he is[,]" referring to the defendant. She stated that the defendant overheard and jumped up, saying, "That ain't me. That ain't me. You all trying to pull stuff. That ain't me." The defendant then called them "every dirty name that he could think of" before saying, "Well, one of you all works at Burlington. I've got my sources -- I've got my sources." The witness explained that she was upset because Wiles used to work at Burlington Coat Factory, so she screamed at the defendant, "What are you, some kind of stalker[?]"

On cross-examination, she testified that there were street lights on each of the four corners of the intersection of Macon and National and that she could see the defendant's face "plain as day." The defendant was wearing a hooded sweatshirt, but it was not pulled all the way over his head and she could see that he had his "hair up in like little twists." He also had a gold, pop-out grill covering his front teeth. She said she described the defendant in her statement as approximately 5'9" or 5'10", but she was not very good at estimating heights. She testified that she did not get out of the truck until a minute or two after her sister exited because Castor initially refused to budge, which blocked her way out. When asked if she was certain of her identification of the defendant, she replied: " I'm not certain; I'm positive -- a hundred percent positive. I'll never forget his face as long as I live. I stared right into it with a pistol in his hand. I know. I'm never going to forget it." Finally, she testified that could not see anyone's teeth in the photographic array she was shown and that none of the men pictured wore his hair in twists.

At the conclusion of the hearing, the trial court concluded that the photographic spreadsheet was not unduly suggestive, noting, among other things, that the six men pictured were similar in appearance and that it was impossible to tell whether the defendant had gold teeth in the photograph. The court further concluded that the showup identification was admissible and did not taint the later photographic identifications, noting that it took place within "a reasonably short period of time" after the robbery, was made by an individual who had "spent several minutes staring down the barrel of the gun," and occurred under circumstances in which it was reasonable for the police, who were still in the initial investigatory phase of the robbery, to seek to eliminate possible suspects. The trial court, therefore, overruled the defendant's motion to suppress the identifications.

**Trial**

The State's first witness at trial was Melanie Butler, who essentially repeated her suppression hearing testimony, albeit in greater detail. She said that a gold-colored, four-door Mitsubishi pulled up to the left of their truck and that all four of its occupants began staring at them. She identified the defendant in the courtroom as the man who stole the truck by emerging from the front passenger seat of the Mitsubishi, placing a gun to her sister's head, and forcing all of them to get out of the truck. She stated that she was delayed in exiting because the front passenger door had to be opened before the third, "suicide door" could open, and Castor, who did not want to give the truck up, initially

-5-

refused to move. She testified that the defendant took off in the truck without closing the passenger doors and that the occupants in the Mitsubishi took off after him.

She further testified that she and her companions called 9-1-1 from a payphone and gave statements to the police officers who responded. She described the formal statement she later gave to a robbery detective and her identification of the defendant from the photographic spreadsheet, testifying that during that time Andrea was in a separate room behind a closed door while she, Castor, and Wiles were together in one large room but separated from each other in different areas. She stated that the defendant's hood was worn so loosely on his head during the robbery that she could see "everything . . . his whole face, his ears -- everything -- like every bit of him -- his hair." The defendant was dressed in a black hooded sweatshirt and jeans, wore his hair in little twists, and had dark eyes, big lips, and teeth that were gold "across the top." On cross-examination, she repeatedly emphasized that she was one hundred percent certain of her identification of the defendant as the gunman. When pressed, she testified that she chose him from the photographic array, despite the fact that he had no twists in his hair in the picture and she could not really see his teeth, "[b]ecause of his face. Because of his cheek structure and because of his head[,]" explaining that "[h]e had a huge head and fat cheeks."

Andrea Butler's account of the robbery was consistent with those of Castor and Melanie Butler. She testified that she noticed a car following their truck shortly before they reached the traffic light, saw a man in the car reach under his seat when they stopped at the light, turned to tell Castor, and then turned back to find the man holding a gun to her head through the open driver's window. She stated that there were street lights in the area and that the gunman's face was within two inches of hers. She described him as dressed in a black hooded sweatshirt, approximately 5'10" in height, dark-skinned, and with a wide-set face and gold teeth. She then made a positive courtroom identification of the defendant as the gunman.

She further testified that when the defendant drove off in the truck, he took with him several valuables that she had left inside, including her purse and wallet containing $150 in cash and Castor's cell phone. She estimated that the police arrived thirty minutes after she and her companions called 9-1-1 and that they remained at the scene almost two hours while they completed their reports. She described going downtown the next day to give a statement and to view photographic arrays and her identification of the defendant's photograph. When asked whether he had any particular features that stood out to her, she mentioned his wide-set face and distinctive eyes and said that she would never forget his face.

On cross-examination, the witness testified that she described the defendant to the police the same way she described him in the courtroom. When shown her statement to police, however, she acknowledged that she had said nothing in it about his wide-set face and had reported a shorter height, describing him as about eighteen years old, 5'8", 155 pounds, dark to medium complexion, medium twists in his hair, gold teeth, and wearing a black hooded jacket and dark-colored pants.

Much of Edward Castor's trial testimony mirrored his earlier suppression hearing testimony. He made a positive courtroom identification of the defendant and explained that he was confident in his identification because he had sat in his truck and looked at him for approximately three minutes.

He said he immediately recognized him in the squad car in Millington and had, in fact, commented to his brother upon their arrival, and before anyone had asked him if he could identify the defendant, "I believe that's the one that carjacked me right there." The defendant was dressed in a white t-shirt instead of the "black hoodie" he had worn during the robbery, but Castor knew him by his face. Castor also described his identification of the defendant from the photographic array. He testified that although the defendant wore his hood up during the robbery, he did not have it drawn tightly around his face.

On cross-examination, Castor acknowledged that the officer in Millington who asked him if he could identify the defendant informed him that the defendant had been found in the truck. He further acknowledged that he had described the defendant in his statement to police as "a male black about nineteen to twenty-two years old," 5'10", 165 pounds, with a medium complexion, several gold teeth on the top, and wearing a gray hooded sweater.

Jennifer Wiles provided an account of the robbery that was consistent with those provided by her friends. She said she got a good look at the man who placed the gun to Andrea's head and described him as a nineteen to twenty-year-old black male with "dark, but not real dark" skin tone wearing a dark-colored "hoodie" or long-sleeved, sweater-like garment. She stated that she was last out of the truck and that the gunman hit her in the head with an object as she was getting out, saying, "Get the fuck out, bitch." She did not see the object but assumed it was his gun.

Wiles testified that she provided an account of the crime to the police officers who responded to the scene. Later that day, she, Castor, Andrea, and Melanie went downtown to the robbery bureau, where they were separated to give their statements and to look at photographs of suspects. She said she was able to identify both the gunman and the driver of the Mitsubishi. She identified the respective spreadsheets from which she had made those identifications and also made positive courtroom identifications of the defendant as the gunman and Pleas as the driver of the Mitsubishi. On cross-examination, she said she described the defendant in her statement as a dark-skinned black male with gold teeth and a dark hoodie over his head.

Deputy Matthew Keaton essentially repeated his suppression hearing testimony as he described the traffic stop that led to the defendant's arrest. He said that a DUI technician was called to the scene because the defendant's breath smelled of alcohol and that he arrived after the registered owner of the truck had already departed from the area. On cross-examination, he testified that the defendant was wearing blue jeans and a white hooded shirt at the time of his arrest.

Deputy Larry Emery of the Shelby County Sheriff's Department testified that he and other officers, including "a dog car," conducted an unsuccessful search for the second suspect in the woods where he had fled. They then returned to the hotel parking lot, learned that a hotel key had been found in the stolen vehicle, went to that room, knocked, and were admitted by a young black man dressed in his underwear, later identified as codefendant Prentice Pleas. Two naked, intoxicated women, identified as Jessica Williams and Donna Banks, were lying in the bed in the room. Pleas informed the officers that he had been in the room all night. Deputy Emery, however, observed a pile of wet muddy clothing on the floor and learned from Ms. Williams that Pleas had just returned to the room. In addition, he and his fellow officers found in the hotel parking lot a gold car matching the

description of the vehicle involved in the robbery and, inside the car, a purse containing the identification of one of the robbery victims.

Sergeant Stephen Wilkerson of the Memphis Police Department, the lead detective assigned to the case, described the photographic identification procedure employed with the victims, testifying that he used a computer program to generate photographs of individuals similar in appearance to the defendant and then chose five to include in the photographic spreadsheet that he and Sergeant Terry Lyons showed to the victims one at a time. He explained that their photographic identification procedure included having each witness read and sign an "advice of rights" form stating that the witness was not to assume that the person responsible for the crime was in the group of photographs, not to place any importance on the order in which the photographs appeared, and not to make an identification unless the witness was positive that the person was responsible for the crime. He stated that the victims were kept separate and not allowed to communicate with each other during the process.

Sergeant Wilkerson further testified that the defendant told him that he had obtained the truck from a friend named Jimmy, whom he had known since grade school, and that his girlfriend owned a gold Mitsubishi Galant. The defendant was, however, unable to provide any contact information for "Jimmy" and soon thereafter refused to answer any more questions.

The defendant elected not to testify, but called as a witness in his defense his sister, Mekesha Baker, who testified that she had never seen him with braids, twists, cornrows, or dreadlocks in his hair. On cross-examination, Baker testified that the defendant's girlfriend, Jessica Williams, owned a gold, four-door car and that the defendant had a gold "pop-out" grill that he wore over some of his top teeth.

## Sentencing Hearing

At the November 14, 2007, sentencing hearing, Henry Turley, a Memphis real estate developer, testified that the defendant and his father had been an integral part of his properties department for the past three and a half years and that he trusted both of them implicitly, gave them unrestricted access to his properties, and hoped to continue his business relationship with them.

The defendant's mother, Cora Eshmon, offered a letter she had written about the defendant to the trial court. In both the letter and her testimony, she described him as a sensitive child who regularly prayed and "cried until he was 12 years old on the crucifixion of Jesus." She said that the defendant had never been in any trouble, had no juvenile or criminal record, and had been working two jobs since the age of fifteen. She expressed her belief that alcohol and peer pressure had played a major role in his involvement in the offenses and asked the trial court to take those things into consideration when imposing the sentence. When questioned about the defendant's juvenile record, which included charges for assault and disorderly conduct, she said she did not believe her son had committed those offenses.

At the conclusion of the hearing, the trial court expressed its belief that "someone who robs someone at gunpoint and pistol whips someone else is a dangerous offender," but the court could not classify the defendant as such because all three of the required criteria had not been met in the case. Specifically, the court stated that although it found the circumstances surrounding the commission of the offenses to be aggravated and the aggregate length of a consecutive sentence reasonably related to the offenses, it could not find that confinement for an extended period of time was necessary to protect society from the defendant's unwillingness to lead a productive life and the defendant's resort to criminal activity in furtherance of an anti-societal lifestyle. However, when the prosecutor questioned the use of those criteria, the trial court agreed to delay its ruling:

> If you can show me that I'm wrong before I rule -- and I haven't ruled yet, but I don't see how under those three criteria –
>
> . . . .
>
> . . . I'm going to hold this over until tomorrow for further -- I have to look into it because the way I read the law, I can't apply that even though I may want to. I think that it's atrocious that someone can pistol whip someone, rob someone. I frankly don't understand how the jury came back with theft of property under $500 when someone was forced at gunpoint out of a vehicle and things were taken from her. But that's my personal view and I'm looking at what the law says. And the way I read it and this is only because of the case law that I see here that says you must find those three things.

At the November 28, 2007, continuation of the hearing, the trial court stated that it had concluded after researching the law that the "standard [sentencing] form" the trial courts used in sentencing was wrong, in that a finding that confinement for an extended period of time was necessary to protect society from the defendant's unwillingness to lead a productive life and the

defendant's resort to criminal activity in furtherance of an anti-societal lifestyle was not required for the imposition of consecutive sentencing under the dangerous offender criterion of the statute. The trial court, therefore, ordered that the defendant serve his three-year sentence for the aggravated assault of Jennifer Wiles consecutively to his eight-year sentence for aggravated robbery, for an effective eleven-year sentence in the Department of Correction:

> In Count IV of this indictment, he was found guilty as charged of aggravated assault of Jennifer Wiles causing bodily injury. He went above and beyond that which was necessary to accomplish the aggravated robbery by striking someone with a pistol when they were doing what they were told. Now, I think it would be unconscionable to run . . . that count concurrent with the eight years. It's basically a free crime.

## ANALYSIS

### I. Denial of Motion to Suppress Identifications

The defendant first contends that the trial court erred in denying his motion to suppress the witness identifications. On appeal, a trial court's findings of fact regarding a motion to suppress are conclusive unless the evidence preponderates against them. State v. Reid, 213 S.W.3d 792, 825 (Tenn. 2006) (citing State v. Ross, 49 S.W.3d 833, 839 (Tenn. 2001)). Any question about the "credibility of witnesses, the weight and value of the evidence, and a resolution of conflicts in the evidence are matters entrusted to the trial judge as the trier of fact." State v. Odom, 928 S.W.2d 18, 23 (Tenn. 1996). The party prevailing at the suppression hearing is afforded the "strongest legitimate view of the evidence and all reasonable and legitimate inferences that may be drawn from that evidence." State v. Keith, 978 S.W.2d 861, 864 (Tenn. 1998). Thus, unless the defendant demonstrates that "the evidence preponderates against the judgment of the trial court, this court must defer to the ruling of the trial court." Reid, 213 S.W.3d at 825 (citing State v. Cribbs, 967 S.W.2d 773, 795 (Tenn. 1998)). However, the application of the law to the facts found by the trial court is a question of law and is reviewed *de novo*. See State v. Yeargan, 958 S.W.2d 626, 629 (Tenn. 1997).

Due process is violated if an identification procedure is: (1) unnecessarily or impermissibly suggestive and (2) gives rise to a "very substantial likelihood of irreparable misidentification." Simmons v. United States, 390 U.S. 377, 384, 88 S. Ct. 967, 971 (1968). In Neil v. Biggers, 409 U.S. 188, 199, 93 S. Ct. 375, 382 (1972), the United States Supreme Court established a two-part test to determine when a defendant's due process rights have been violated by a pretrial identification. Under this test, the court first considers whether the identification procedure itself was unduly or unnecessarily suggestive. Id. If the identification procedure is found to have been suggestive, the court next considers "whether under the totality of the circumstances the identification was reliable even though the confrontation procedure was suggestive." Id. (interior quotations omitted); see also Stovall v. Denno, 388 U.S. 293, 302, 87 S. Ct. 1967, 1972 (1967) (stating that "a claimed violation of due process of law in the conduct of a confrontation depends on the totality of the circumstances surrounding it").

The factors to be considered in evaluating the reliability of an identification obtained as part of a suggestive identification procedure include: (1) the opportunity of the witness to view the

criminal at the time of the crime; (2) the witness's degree of attention; (3) the accuracy of the witness's prior description of the criminal; (4) the level of certainty demonstrated by the witness at the confrontation; and (5) the length of time between the crime and the confrontation. See Biggers, 409 U.S. at 199-200, 93 S. Ct. at 382. The corrupting effect of the suggestive procedure is weighed against these factors. See Manson v. Brathwaite, 432 U.S. 98, 114, 97 S. Ct. 2243, 2253 (1977).

There is, however, no need for the court to apply the totality of the circumstances test outlined in Biggers if it first determines that the identification procedure itself was neither unnecessarily or impermissibly suggestive nor likely to create a substantial likelihood of irreparable misidentification. See State v. Biggs, 211 S.W.3d 744, 749 (Tenn. Crim. App. 2006) (citations omitted).

Showup identification procedures have long been considered to be "inherently suggestive and unfair to the accused." State v. Thomas, 780 S.W.2d 379, 381 (Tenn. Crim. App. 1989). For this reason, Tennessee courts have repeatedly condemned the use of showups as a means of establishing the identity of an individual suspected of committing a crime, unless "(a) there are imperative circumstances which necessitate a showup, or (b) the showup occurs as an on-the-scene investigatory procedure shortly after the commission of the crime." Id. (citations omitted).

The trial court found that the showup identification was reasonable and reliable under the circumstances, having been conducted within a few hours of the robbery while the police were still in the initial investigatory stages and made by an individual who had viewed the defendant face-to-face while staring down the barrel of a gun. The record does not preponderate against these findings. The record establishes that the robbery occurred sometime between 1:30 and 2:15 a.m., the defendant was stopped at approximately 4:00 a.m., and Castor identified him sometime around 5:00 a.m. after his arrival in Millington to reclaim his truck. Thus, the identification was made within a relatively short period of the robbery and very soon after the officers who arrested the defendant had discovered that he was driving a stolen truck.

Furthermore, an analysis of the Biggers factors supports the trial court's conclusion that a substantial risk of misidentification did not exist in this case. As for the first factor, the defendant was very close to the victims and made no attempts to conceal his face. In addition, the area was well-lit by both street lights and the truck's interior lights. With respect to the second factor, Castor indicated that he paid close attention during the robbery, testifying that he sat and stared at the defendant's face for a full three minutes and knew him immediately when he saw him in the squad car because he had watched him hold a gun to his girlfriend's head only a couple of hours earlier. The third factor, the accuracy of the witness's prior description of the criminal, is not clearly met, as Castor testified at trial that he could not recall if he provided the police who responded to the scene with a description of the robber. As for the fourth factor, Castor positively and unequivocally identified the defendant as the gunman, repeatedly testifying at the suppression hearing and at trial that he was confident in his identification. Finally, the identification occurred approximately three hours after the robbery, while the confrontation was still fresh in Castor's mind. Thus, four of the five Biggers factors support the reliability and accuracy of the identification. Under such circumstances, we conclude that the trial court did not err in overruling the defendant's motion to suppress the results of the showup identification.

The defendant also argues that the trial court erred in denying his motion to suppress the photographic identifications. "Photographs contained in a photographic array do not have to mirror the accused. Instead, the law simply requires that the police refrain from 'suggestive identification procedures.'" State v. Hall, 976 S.W.2d 121, 153 (Tenn. 1998) (quoting Biggers, 409 U.S. at 196, 93 S. Ct. at 380 (1972)). Accordingly, "a photographic identification is admissible unless, based upon the totality of the circumstances, 'the confrontation conducted . . . was so unnecessarily suggestive and conducive to irreparable mistaken identification that [the accused] was denied due process of law.'" Id. (quoting Stovall, 388 U.S. at 301-02, 87 S. Ct. at 1972). The risk of irreparable mistaken identification is heightened if one of the photographs in the photographic lineup "is in some way emphasized," or if "the police indicate to the witness that they have other evidence that one of the persons pictured committed the crime." Simmons, 390 U.S. at 383, 88 S. Ct. at 971.

The defendant argues that his photographic array was unduly suggestive because he was the only one "that was shown with his gold 'grill' showing prominently on the photographs." We agree with the trial court, however, that it is not clear from the photograph whether any gold is visible on the defendant's teeth. While it is true that the defendant is the only man pictured with his mouth slightly open, revealing the lower portion of his two upper front teeth, all six men have similar features, skin tone, and hairstyles. Moreover, the victims were separated for their respective identifications and instructed not to identify anyone unless certain of the identification. In sum, we conclude that the trial court did not err in admitting the results of the victims' pretrial identifications of the defendant.

## II. Sufficiency of the Evidence

The defendant next challenges the sufficiency of the convicting evidence, arguing that the victims' in-court identifications of him as the perpetrator were not credible given the "unduly suggestive" photographic lineup and "inherently unfair" showup that preceded it. He further argues that even if the pretrial identifications were proper, the victims' in-court identifications were nonetheless unreliable in light of the early hour at which the robbery occurred, the fact that the victims had been drinking, the "matter of minutes" that elapsed during the entire episode, and the fact that the defendant was dressed in a white hooded sweatshirt at the time of his arrest while the victims described the robber as having worn a dark "hoodie" over his head. In addition, the defendant asserts that "it was improper and unfairly prejudicial" for the trial court to allow the State to question the Butler sisters about their verbal altercation with the defendant outside the courtroom, as "testimony from the witness to indicate that she was threatened by the [d]efendant was only elicited before the jury to poison their consideration of the evidence."

When the sufficiency of the convicting evidence is challenged on appeal, the relevant question for the reviewing court is "whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." Jackson v. Virginia, 443 U.S. 307, 319, 99 S. Ct. 2781, 2789 (1979); see also Tenn. R. App. P. 13(e) ("Findings of guilt in criminal actions whether by the trial court or jury shall be set aside if the evidence is insufficient to support the findings by the trier of fact of guilt beyond a reasonable doubt."); State v. Evans, 838 S.W.2d 185, 190-92 (Tenn. 1992); State v. Anderson, 835 S.W.2d 600, 604 (Tenn. Crim. App. 1992).

All questions involving the credibility of witnesses, the weight and value to be given the evidence, and all factual issues are resolved by the trier of fact. See State v. Pappas, 754 S.W.2d 620, 623 (Tenn. Crim. App. 1987). "A guilty verdict by the jury, approved by the trial judge, accredits the testimony of the witnesses for the State and resolves all conflicts in favor of the theory of the State." State v. Grace, 493 S.W.2d 474, 476 (Tenn. 1973). Our supreme court stated the rationale for this rule:

> This well-settled rule rests on a sound foundation. The trial judge and the jury see the witnesses face to face, hear their testimony and observe their demeanor on the stand. Thus the trial judge and jury are the primary instrumentality of justice to determine the weight and credibility to be given to the testimony of witnesses. In the trial forum alone is there human atmosphere and the totality of the evidence cannot be reproduced with a written record in this Court.

Bolin v. State, 219 Tenn. 4, 11, 405 S.W.2d 768, 771 (1966) (citing Carroll v. State, 212 Tenn. 464, 370 S.W.2d 523 (1963)).

A jury conviction removes the presumption of innocence with which a defendant is initially cloaked and replaces it with one of guilt, so that on appeal, a convicted defendant has the burden of demonstrating that the evidence is insufficient. See State v. Tuggle, 639 S.W.2d 913, 914 (Tenn. 1982).

We conclude that the evidence was more than sufficient to establish the defendant's identity in this case. The defendant was discovered driving the stolen truck approximately two hours after the robbery occurred, did not initially pull over when the sheriff's deputies initiated the traffic stop, and fled on foot down the highway before he was captured. At the same time, his passenger escaped on foot into the nearby woods. A short time later, officers found a hotel room key in the stolen truck that led them to the room where they discovered the underwear-clad codefendant with a pile of wet and muddy clothing on the floor and two women, one of whom was the defendant's girlfriend, in the bed. In the parking lot of that same hotel, officers located a car matching the description of the vehicle involved in the robbery, with victim Andrea Butler's purse inside the vehicle. Finally, Castor identified the defendant as the gunman during the informal showup procedure held within a few hours of the robbery; all four victims picked his photograph from the photographic arrays they were separately shown by police later that same day; and all four victims positively and confidently identified him in the courtroom as the gunman. The proof at trial was that only two of the four victims had been drinking, and there was no evidence that the amount of alcohol that those two had consumed prevented them from being able to notice, relate, and identify details about the crime and the defendant's appearance. A victim's identification of a defendant as the perpetrator of an offense is, alone, sufficient to establish identity. See State v. Hill, 987 S.W.2d 867, 870 (Tenn. Crim. App. 1998); State v. Strickland, 885 S.W.2d 85, 87 (Tenn. Crim. App. 1993). We conclude, therefore, that the evidence was sufficient to sustain the defendant's convictions.

As for the defendant's claim that he was prejudiced by the Butler sisters' testimony that he had threatened them outside the courtroom, we note that neither sister provided the full details of that encounter during their testimony before the jury. At trial, each sister testified that she had identified

the defendant outside the courtroom at the time of an earlier court hearing. Melanie Butler testified that after her sister pointed out the defendant, the defendant replied, "You've got the wrong person, 'ho -- it ain't me, 'ho." Andrea Butler testified that she pointed out the defendant to Castor and that the defendant replied, "Oh, you've got the wrong guy," which led to an argument. She did not provide any details of that argument, and neither she nor her sister said anything about the defendant's having threatened them.

### III. Consecutive Sentencing

Finally, the defendant contends that the trial court's imposition of consecutive sentencing was error because it "made two disparate rulings on the nature of the [d]efendant and whether he was a 'dangerous offender.'" He further argues that the record does not support a finding that he was a dangerous offender.

Tennessee Code Annotated section 40-35-115(b) provides that it is within the trial court's discretion to impose consecutive sentencing if it finds by a preponderance of the evidence that any one of a number of criteria applies, including that "[t]he defendant is a dangerous offender whose behavior indicates little or no regard for human life, and no hesitation about committing a crime in which the risk to human life is high." Tenn. Code Ann. § 40-35-115(b)(4) (2006). When a trial court bases consecutive sentencing upon its classification of the defendant as a dangerous offender, it is required to make further findings that the aggregate length of the defendant's sentence reasonably relates to the severity of his offenses and is necessary to protect the public from further criminal conduct of the defendant. State v. Lane, 3 S.W.3d 456, 460-61 (Tenn. 1999); State v. Wilkerson, 905 S.W.2d 933, 937-38 (Tenn. 1995).

As an initial matter, we disagree with the defendant's contention that the trial court issued two disparate rulings in the case. The trial court made it clear that it was reserving its ruling pending further research on the law regarding dangerous offender classification. We further disagree with the defendant's contentions that the trial court failed to make the requisite findings of fact in support of his dangerous offender classification or that the record failed to support the trial court's imposition of consecutive sentencing on that basis. At the continuation of the sentencing hearing, the trial court correctly noted that the form from which it had been working erroneously included language derived from Gray v. State, 538 S.W.2d 391, 393 (Tenn. 1976) – that the trial court must find that the defendant is unwilling to lead a productive life and resorts to criminal activity in furtherance of his anti-societal lifestyle – as a requirement for a trial court's imposition of consecutive sentencing under the dangerous offender criterion of the statute. In State v. Spencer Peterson, No. W2005-01701-CCA-R3-CD, 2006 WL 1215138, at *3 (Tenn. Crim. App. May 5, 2006), perm. to appeal denied (Tenn. Oct. 2, 2006), we made it clear that such a finding is not required for consecutive sentencing as a dangerous offender:

> [T]he Appellant contends that the trial court erred in finding that consecutive sentencing is necessary to protect the public from further criminal activity. In support of this assertion, the Appellant submits that our supreme court in Gray v. State, 538 S.W.2d 391, 393 (Tenn. 1976), "mandate[d] that this criteria include a finding that the defendant is unwilling to lead a productive life and has resorted to criminal activity

in furtherance of his anti-societal lifestyle." This assertion is misplaced. This language, as <u>Gray</u> notes, applies only to the persistent offender, professional criminal, and the multiple offender, those being classifications which are based on a history of repeated criminal conduct. The plain language of <u>Gray</u> clearly provides that a defendant may be classified as a dangerous offender *if the crimes for which he is convicted* indicate that he has little or no regard for human life and no hesitation about committing a crime in which the risk to human life is high. Obviously, a trial court may consider an appellant's past criminal history, if such criminal history exists, but such review is not mandated.

<u>Id.</u> (emphasis in original) (footnote and citation omitted).

Here, the trial court made the required findings that the defendant was a dangerous offender whose behavior evidenced little or no concern for human life and no hesitation about committing a crime when the risk to human life was high and that the aggregate length of his eleven-year sentence reasonably related to the severity of his offenses and was necessary to protect the public from his further criminal conduct. Moreover, the record amply supports the trial court's determinations. The defendant held a pistol against the head of an eight-and-a-half-month pregnant woman, cocked the gun, threatened to kill her if she moved the vehicle, threatened to kill her companions, and struck one of the victims in the head with the gun because she did not move fast enough to satisfy him. In addition, the defendant threatened the victims when he encountered them outside the courtroom at the suppression hearing. These actions, in our view, are sufficient to support the trial court's classification of the defendant as a dangerous offender. We conclude, therefore, that the trial court did not err in imposing consecutive sentences.

## CONCLUSION

Based on our review, we conclude that the trial court properly denied the motion to suppress, that the evidence was sufficient to establish the defendant's identity as the perpetrator of the offenses, and that the record supports the trial court's imposition of consecutive sentencing under the dangerous offender criterion of the consecutive sentencing statute. Accordingly, we affirm the judgments of the trial court.

_____
ALAN E. GLENN, JUDGE